37 F.3d 1422
 63 USLW 2176
 PONCA TRIBE OF OKLAHOMA, Plaintiff-Appellant,
v.
STATE OF OKLAHOMA; David Walters, Governor of the State of
Oklahoma, individually and in his official
capacity, Defendants-Appellees.
PUEBLO OF SANDIA, Plaintiff-Appellant,
v.
Bruce KING, Governor, State of New Mexico; State of New
Mexico, Defendants-Appellees,
States of Alabama, Arizona, California, Connecticut,
Florida, Kansas, Michigan, Mississippi, Montana,
Nebraska, Nevada, Oklahoma, Rhode
Island, South Dakota, and
Washington, Amici Curiae.
MESCALERO APACHE TRIBE, The Reservation, Plaintiff-Appellant,
v.
STATE OF NEW MEXICO; Bruce King, Governor of the State of
New Mexico, Defendants-Appellees,
States of Alabama, Arizona, California, Connecticut,
Florida, Kansas, Michigan, Mississippi, Montana,
Nebraska, Nevada, Oklahoma, Rhode
Island, South Dakota, and
Washington, Amici Curiae.
KICKAPOO TRIBE, also known as Kickapoo Nation in Kansas, of
the Kickapoo reservation in Kansas; Steve Cadue, tribal
chairman of the Kickapoo Nation in Kansas; Prairie Band of
Potawatomi Indians, a federally recognized tribe, Plaintiffs-Appellees,
v.
STATE OF KANSAS, Defendant-Appellant.
 Nos. 92-6331, 93-2018, 93-2020 and 93-3110.
 United States Court of Appeals, Tenth Circuit.
 Sept. 2, 1994.
Rehearing Denied Sept. 27, 1994 in No. 93-3110.
As Amended Oct. 28, 1994.
 
 Gary S. Pitchlynn of Pitchlynn, Odom, Morse & Ritter, Norman, OK (Ted Ritter and Patrick A. Morse, of Pitchlynn, Odom, Morse & Ritter, with him on the brief), for plaintiff-appellant Ponca Tribe of Oklahoma.
 Neal Leader, Senior Asst. Atty. Gen., Oklahoma City, OK, for defendants-appellees State of Okl. and David Walters, Governor, State of Okl.
 L. Lamar Parrish of Ussery & Parrish, Albuquerque, NM, for plaintiff-appellant Pueblo of Sandia.
 Gregory M. Quinlan of Fettinger & Bloom, Alamogordo, NM (George E. Fettinger of Fettinger & Bloom, with him on the brief), for plaintiff-appellant Mescalero Apache Tribe.
 Paul G. Bardacke of Eaves, Bardacke & Baugh, Albuquerque, NM (Kerry C. Kiernan of Eaves, Bardacke & Baugh and Gerald Velarde, Asst. Atty. Gen., Santa Fe, NM), for defendants-appellees State of N.M. and Bruce King, Governor, State of N.M.
 John W. Campbell, Deputy Atty. Gen., Topeka, KS (Robert T. Stephan, Atty. Gen., State of Kan., with him on the brief), for defendant-appellant State of Kan.
 Glenn M. Feldman of O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, AZ (Lance Burr, Lawrence, Kansas, with him on the brief), for plaintiff-appellee Kickapoo Tribe.
 Robert L. Pirtle of Pirtle, Morisset, Schlosser & Ayer, Seattle, WA (C. Bruce Works of Works, Works & Works, Topeka, KS, with him on the brief), for plaintiff-appellee Prairie Band of Potawatomi Indians.
 Hans Walker, Jr., Washington, DC, for amicus curiae Nat. Indian Gaming Ass'n.
 Thomas F. Gede, Sp. Asst. Atty. Gen., Sacramento, CA (Daniel E. Lungren, Atty. Gen., State of Cal., Jimmy Evans, Atty. Gen., State of Ala., Grant Woods, Atty. Gen., State of Ariz., Richard Blumenthal, Atty. Gen., State of Conn., Robert A. Butterworth, Atty. Gen., State of Fla., Robert T. Stephan, Atty. Gen., State of Kan., Frank J. Kelley, Atty. Gen., State of Mich., Mike Moore, Atty. Gen., State of Miss., Joseph P. Mazurek, Atty. Gen., State of Mont., Don Stenberg, Atty. Gen., State of Neb., Frankie Sue Del Papa, Atty. Gen., State of Nev., Susan B. Loving, Atty. Gen., State of Okl., Jeffery B. Pine, Atty. Gen., State of R.I., Mark Barnett, Atty. Gen., State of S.D., and Christine O. Gregoire, Atty. Gen., State of Wash.), for amici curiae the States of Ala., Ariz., Cal., Conn., Fla., Kan., Mich., Miss., Mont., Neb., Nev., Okl., R.I., S.D. and Wash.
 Before ANDERSON, McKAY, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 These appeals arise from the desire of four Indian tribes to develop gaming operations on their lands pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. Sec. 2701, et seq.[1] In the wake of failed negotiations to craft tribal-state compacts with Kansas, New Mexico, and Oklahoma--the states in which the gaming would be situated--the tribes seek an injunction under IGRA requiring the states to negotiate compacts. We consider first, whether IGRA abrogates the states' Eleventh Amendment immunity, and second, whether IGRA violates the Tenth Amendment. Because the tribes also seek an order directing the Governors to negotiate compacts, we address whether the tribes have stated a cognizable claim under the doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).[2]
 
 I. BACKGROUND
 
 2
 In response to the proliferation of Indian gaming operations in the early 1980s, Congress enacted IGRA in 1988 to establish a comprehensive regulatory framework for gaming activities on Indian lands. IGRA seeks to balance the interests of tribal governments, the states, and the federal government. First, IGRA aims "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. Sec. 2702(1). Concurrently, the statute contemplates a regulatory and supervisory role for the states and the federal government to prevent the infiltration of "organized crime and other corrupting influences." 25 U.S.C. Sec. 2702(2). See S.Rep. No. 446, 100th Cong., 2d Sess. 1-3 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3071-73.
 
 
 3
 IGRA creates a three-tiered classification of gaming operations and provides varying degrees of federal, state, and tribal regulation over each class. Class I gaming, over which Indian tribes exercise exclusive regulatory control, consists of social games for minimal prizes or as part of tribal ceremonies or celebrations. 25 U.S.C. Secs. 2703(6) & 2710(a)(1). Class II gaming includes "bingo ... pull tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo" and non-banking card games. 25 U.S.C. Sec. 2703(7).[3] Indian tribes may only engage in, license, and regulate Class II gaming if the state in which the gaming is located permits such forms of gaming. 25 U.S.C. Sec. 2710(b)(1). So long as the state permits such gaming, the Indian tribes maintain regulatory jurisdiction over Class II gaming subject to the supervision of the National Indian Gaming Commission (an entity within the Department of Interior). 25 U.S.C. Secs. 2710(a)(2) & 2704(a).
 
 
 4
 Class III gaming includes all forms of gaming not named in Classes I and II (e.g. banking card games, slot machines, casinos, horse and dog racing, and jai-alai). 25 U.S.C. Sec. 2703(8); S.Rep. No. 446, 100th Cong., 2d Sess. 7 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3077. Pursuant to Sec. 2710(d)(1), Class III gaming activities are lawful on Indian lands only if the gaming is: (1) authorized by a tribal ordinance approved by the tribe's Chairman; (2) located in a state that permits such gaming; and (3) conducted in conformance with a compact between the Indian tribe and the state. To facilitate this third requirement, Sec. 2710(d)(3)(A) directs the states to "negotiate with the Indian tribe in good faith" to craft a compact governing Class III gaming. The Congress stated that "the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met...." 1988 U.S.C.C.A.N. at 3083.
 
 
 5
 As the appeals before us demonstrate, however, tribal-state cooperation has often proved elusive. In contemplation of this occurrence, Congress provided for judicial review of a tribe's allegation that a state has failed to negotiate a tribal-state compact in good faith. Section 2710(d)(7)(A)(i) provides that:The United States district courts shall have jurisdiction over ... any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe for the purpose of entering into a Tribal-State compact ... or to conduct such negotiations in good faith.
 
 
 6
 The state bears the burden of proving that it has negotiated with the tribe in good faith. 25 U.S.C. Sec. 2710(d)(7)(B)(ii). To determine whether a state has failed to negotiate in good faith, the court may consider "the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities," as well as "any demand by the State for direct taxation of the Indian tribe or of any Indian lands." 25 U.S.C. Sec. 2710(d)(7)(B)(iii).
 
 
 7
 If the district court concludes that the state has failed to negotiate in good faith, IGRA provides a cascade of enforcement mechanisms to authorize Class III gaming on Indian lands. First, the court shall order the tribe and state to develop a compact within sixty days. 25 U.S.C. Sec. 2710(d)(7)(B)(iii). If the parties fail to develop a tribal-state compact within this sixty-day period, the tribe and the state each must submit a proposed compact to a mediator appointed by the district court. 25 U.S.C. Sec. 2710(d)(7)(B)(iv). "The mediator shall select from the two proposed compacts the one which best comports with the terms of [IGRA] and any other applicable Federal law and with the findings and order of the court." Id. Once the mediator submits the selected compact to the state and the tribe, the state has sixty days in which to consent. 25 U.S.C. Secs. 2710(d)(7)(B)(v) & (vi).
 
 
 8
 If the state consents to the proposed compact selected by the mediator within the sixty-day period, that compact becomes binding on the state and the tribe. 25 U.S.C. Sec. 2710(d)(7)(B)(vi). However, if the state does not consent, the mediator shall notify the Secretary of the Interior, who shall authorize Class III gaming by prescribing governing procedures that "are consistent with the proposed compact selected by the mediator, the provisions of [IGRA] and the relevant provisions of the laws of the State." 25 U.S.C. Sec. 2710(d)(7)(B)(vii).
 
 
 9
 The tribes in the instant cases allege that Kansas, New Mexico, and Oklahoma have violated Sec. 2710(d)(3)(A) by failing to negotiate in good faith. The suits proceeded individually in the district courts. Each state moved to dismiss under Fed.R.Civ.P. 12(b)(1) on Eleventh Amendment grounds. Additionally, New Mexico and Oklahoma contended that IGRA violates the Tenth Amendment and that the tribes could not obtain injunctive relief against their Governors under the doctrine of Ex parte Young.
 
 
 10
 The district courts reached conflicting conclusions on the states' defenses. In Ponca Tribe of Oklahoma v. Oklahoma, 834 F.Supp. 1341 (W.D.Okla.1992) ("Ponca "), Pueblo of Sandia v. King, slip op. No. CIV-92-0613-JC, 1992 WL 540817 (D.N.M.1992) ("Pueblo of Sandia "), and Mescalero Apache Tribe v. New Mexico, slip. op. No. CIV-92-076-JC, 1992 WL 685374 (D.N.M.1992) ("Mescalero Apache "), the courts held that the Eleventh Amendment barred the tribes' suits because Congress lacked the authority to abrogate the states' Eleventh Amendment immunity. The courts thus dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). The courts also held that the suits against the Governors of Oklahoma and New Mexico fell outside the parameters of the Ex parte Young doctrine because a court order to negotiate a tribal-state compact would infringe upon executive discretion. Lastly, the courts ruled that IGRA violates the Tenth Amendment because it requires states to negotiate tribal-state compacts, does not afford states the option to refuse to regulate Class III gaming, and allows the Secretary of the Interior to commandeer state governments to regulate Class III gaming. We have jurisdiction under 28 U.S.C. Sec. 1291 to entertain the tribes' appeals of these rulings.
 
 
 11
 In the fourth case, Kickapoo Tribe of Indians v. Kansas, 818 F.Supp. 1423 (D.Kan.1993) ("Kickapoo "), the district court held that Congress does have the power to abrogate the states' Eleventh Amendment immunity pursuant to IGRA and that Kansas may therefore be sued in federal court for failing to negotiate a tribal-state compact in good faith.[4] We have jurisdiction over Kansas' appeal under the collateral order doctrine. Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc., --- U.S. ----, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993) (permitting an immediate appeal of a court's denial of Eleventh Amendment immunity because the state's purported right to be free from suit cannot be effectively vindicated on appeal after trial).
 
 
 12
 We review de novo the district courts' Rule 12(b)(1) rulings on the States' Eleventh Amendment claims. Williams v. United States, 957 F.2d 742, 743 (10th Cir.1992). We also review de novo the courts' legal conclusions that IGRA violates the Tenth Amendment and that the Ex parte Young doctrine is inapplicable. Estate of Holl v. Commissioner of Internal Revenue, 967 F.2d 1437, 1438 (10th Cir.1992).
 
 II. THE ELEVENTH AMENDMENT
 
 13
 The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Supreme Court has held that the states' Eleventh Amendment immunity extends as well to suits commenced by Indian tribes. Blatchford v. Native Village of Noatak, 501 U.S. 775, 782, 111 S.Ct. 2578, 2583, 115 L.Ed.2d 686 (1991). Thus, the Eleventh Amendment imposes a constitutional limitation on the jurisdiction of Article III courts. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984).
 
 
 14
 The Court has, however, identified three instances in which the Eleventh Amendment does not deprive an Article III court of jurisdiction to entertain allegations of state governmental wrongdoing. First, Congress may abrogate the states' Eleventh Amendment immunity "by making its intention unmistakably clear" in the text of a federal statute enacted pursuant to a constitutional provision that empowers Congress with abrogation rights. Dellmuth v. Muth, 491 U.S. 223, 227-28, 109 S.Ct. 2397, 2399-2400, 105 L.Ed.2d 181 (1989). Second, a state may expressly waive Eleventh Amendment immunity. Edelman v. Jordan, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974). And third, we may consider a suit against a state official to enjoin a non-discretionary violation of federal law. Ex parte Young, 209 U.S. 123, 159-160, 28 S.Ct. 441, 453-454, 52 L.Ed. 714 (1908).
 
 
 15
 Our Eleventh Amendment analysis of the tribes' suits consists of two inquiries: whether IGRA expresses an unmistakable Congressional intent to abrogate the states' Eleventh Amendment immunity, and if so, whether the Constitution empowers Congress to abrogate the states' Eleventh Amendment immunity pursuant to the Indian Commerce Clause, Art. I, Sec. 8, cl. 3.
 
 A. Congressional Intent to Abrogate
 
 16
 The Supreme Court adheres to a rigorous test to determine whether Congress has abrogated the States' Eleventh Amendment immunity: Congress must make its intention to abrogate "unmistakably clear in the language of the statute." Dellmuth, 491 U.S. at 228, 109 S.Ct. at 2400 (quoting Atascadero State Hospital v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)). It is not sufficient generally that Congress has given jurisdiction to federal courts to consider certain kinds of claims. The mere "fact that Congress grants jurisdiction to hear a claim does not suffice to show Congress has abrogated all defenses to that claim." Blatchford, 501 U.S. at 786 n. 4, 111 S.Ct. at 2585 n. 4; Atascadero, 473 U.S. at 246, 105 S.Ct. at 3149 ("A general authorization for suit in federal court is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment."). Rather, to abrogate the states' Eleventh Amendment immunity, Congress must clearly express its intent that states may be brought into federal court to answer to the particular charge at issue.
 
 
 17
 IGRA specifically empowers federal courts to entertain "any cause of action initiated by an Indian tribe arising from the failure of a State to enter into negotiations with the Indian tribe." 25 U.S.C. Sec. 2710(d)(7)(A)(i). Additionally, Section 2710(d)(7)(B) places the burden of proving good faith in such an action on the states. Inasmuch as a state is the only conceivable defendant in such a suit, and it must be contemplated that the state will be a party if a burden of proof is allocated to it, Congress has unmistakably expressed its intent to subject states to suit in federal court under IGRA and thus satisfies the Supreme Court's abrogation test. Seminole Tribe of Florida v. Florida, 11 F.3d 1016, 1024 (11th Cir.1994); Cheyenne River Sioux Tribe v. South Dakota, 3 F.3d 273, 281 (8th Cir.1993). Indeed, every court that has considered this question has concluded that IGRA embodies a clear expression of Congressional intent to abrogate state sovereign immunity. Neither the states nor amici in the instant case has cited any authority to the contrary.
 
 
 18
 Despite IGRA's failure to refer specifically to the Eleventh Amendment, as Congress did, for example, in the Americans with Disabilities Act, 42 U.S.C. Sec. 12202, we do not read the Supreme Court's Eleventh Amendment jurisprudence as imposing any such requirement. Indeed, the Supreme Court has found Congressional abrogation even when federal statutes fail to refer specifically to the Eleventh Amendment or state sovereign immunity. See, e.g., Pennsylvania v. Union Gas Co., 491 U.S. 1, 13, 109 S.Ct. 2273, 2280, 105 L.Ed.2d 1 (1989); Fitzpatrick v. Bitzer, 427 U.S. 445, 449, 96 S.Ct. 2666, 2668, 49 L.Ed.2d 614 (1976).[5]
 
 
 19
 To be sure, the Court in Dellmuth observed that the Education of the Handicapped Act ("EHA"), 20 U.S.C. Sec. 1400 et seq., "makes no reference whatsoever to either the Eleventh Amendment or the State's sovereign immunity." Dellmuth, 491 U.S. at 231, 109 S.Ct. at 2402. However, the Court's conclusion in Dellmuth that the EHA did not abrogate the states' Eleventh Amendment turned not on the absence of any specific mention of the Eleventh Amendment, but rather on the determination that the statute's structure merely created a "permissible inference" that Congress intended to subject the States to damage actions for violations of the EHA and it did not compel such a conclusion. Id. at 231-32, 109 S.Ct. at 2402-03.[6] In contrast, the only inference that can be drawn from IGRA's language is that Congress meant to strip the states of their Eleventh Amendment immunity for failing to negotiate a tribal-State compact in good faith. 25 U.S.C. Sec. 2710(d)(7)(A)(i).
 
 
 20
 Congress need not express its intent to abrogate in a particular talismanic incantation, but can make its intention unmistakably clear in the text of a statute without specific reference to the Eleventh Amendment or state sovereign immunity. Because IGRA satisfies this test, we affirm the district courts' ruling that Congress intended to abrogate the states' Eleventh Amendment immunity in IGRA.
 
 B. Congressional Power to Abrogate
 
 21
 Having concluded that IGRA authorizes suits against the States, we next must consider whether the Indian Commerce Clause empowers Congress to override the states' Eleventh Amendment immunity.[7] This question has sharply divided the courts. Compare Spokane Tribe v. Washington, 28 F.3d 991 (9th Cir.1994) (upholding Congress' authority to abrogate Eleventh Amendment immunity pursuant to the Indian Commerce Clause), Cheyenne River Sioux Tribe, 3 F.3d at 281 (same), with Seminole Tribe of Florida, 11 F.3d at 1028 (concluding that Congress lacks the power to abrogate Eleventh Amendment immunity under IGRA).
 
 
 22
 The abrogation doctrine is based on the principle that, while the Eleventh Amendment imposes a constitutional limitation on the jurisdiction of Article III courts, Congress may remove the amendment's specific constraint on federal judicial power by a federal statute enacted pursuant to certain constitutional provisions bestowing plenary powers on Congress. See Dellmuth, 491 U.S. at 227, 109 S.Ct. at 2399. The Court first articulated the concept of abrogation in Fitzpatrick, holding that Congress may abrogate Eleventh Amendment immunity in legislation enacted pursuant to Sec. 5 of the Fourteenth Amendment. Fitzpatrick, 427 U.S. at 456, 96 S.Ct. at 2671.
 
 
 23
 The dual rationale underlying the Court's analysis in Fitzpatrick was that the Fourteenth Amendment expanded federal power at the same time that it contracted state power. "When Congress acts pursuant to Sec. 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional amendment whose other sections by their own terms embody limitations on state authority." Id. (upholding money award against a state under Title VII of the Civil Rights Act of 1964 because the "Eleventh Amendment, and the principle of state sovereignty which it embodies, ... are necessarily limited by the enforcement provisions of Sec. 5 of the Fourteenth Amendment").
 
 
 24
 Not until 1989 did the Court recognize a second constitutional source of authority for Congressional abrogation, namely, the Interstate Commerce Clause. Union Gas, 491 U.S. at 13-23, 109 S.Ct. at 2280-86 (plurality opinion).[8] Anchored on the dual principles articulated in Fitzpatrick, Justice Brennan's plurality opinion in Union Gas explained that, like the Fourteenth Amendment, the "Commerce Clause withholds power from the States at the same time as it confers it on Congress." Id. at 19, 109 S.Ct. at 2284. The plurality added that "to the extent that the States gave Congress the authority to regulate commerce, they also relinquished their immunity where Congress found it necessary, in exercising this authority, to render them liable." Id. at 19-20, 109 S.Ct. at 2284-85. As in Fitzpatrick, the plurality in Union Gas observed that the Commerce Clause reflected a shift in the balance of power between the states and the federal government under our constitutional structure, a logical consequence of which is that Congress may exercise its plenary powers by subjecting the states to suit in federal court. This theory of structural federalism pervades the Court's Eleventh Amendment jurisprudence. See Alex E. Rogers, Note, Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine, 92 Colum.L.Rev. 1243, 1253-64 (1992).
 
 
 25
 In an attempt to sap Union Gas of any doctrinal significance, the states in the instant cases first make much of the fact that the Court was splintered in Union Gas and that Justice White, the fifth vote on the Commerce Clause abrogation question, stated that he did "not agree with much of [Justice Brennan's] reasoning." Id. at 57, 109 S.Ct. at 2296.[9] However, we are unwilling to sweep aside Union Gas as lacking precedential value or guidance for our analysis. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds....' " Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, J.J.)). It is beyond dispute that five Justices in Union Gas held that Congress possesses the power to abrogate Eleventh Amendment immunity pursuant to the Interstate Commerce Clause of Article I.
 
 
 26
 Also, we find informative the Union Gas plurality opinion's reliance on the dual factors articulated in Fitzpatrick to explain Congress' ability to abrogate: the Commerce Clause "with one hand gives power to Congress while, with the other, it takes power away from the States." Union Gas, 491 U.S. at 16, 109 S.Ct. at 2282. Thus, for purposes of Congress' abrogation authority, and "the Eleventh Amendment's role as an essential component of our constitutional [federal-state] structure," Dellmuth, 491 U.S. at 228, 109 S.Ct. at 2400, we perceive no constitutional distinction between the plenary powers bestowed in the Fourteenth Amendment, the Interstate Commerce Clause, and the Indian Commerce Clause.
 
 
 27
 Consistent with our understanding of Congress' plenary powers and the teachings of Fitzpatrick and Union Gas, the Ninth Circuit recently held that IGRA strips the states of their Eleventh Amendment immunity because Congress enacted the statute pursuant to its plenary powers under the Indian Commerce Clause. Spokane Tribe, 28 F.3d 991, 995-997. "[T]he analysis developed by the Supreme Court in both Union Gas and Fitzpatrick v. Bitzer is equally applicable to the Indian Commerce Clause.... [A]s in Union Gas and Fitzpatrick, Congress is acting under one of its plenary powers." Id. at 996. See also Cheyenne River Sioux Tribe, 3 F.3d at 280 ("[g]iven Congress' plenary authority over Indian relations ... Congress, when acting pursuant to the Indian Commerce Clause, has the power to abrogate the States' [eleventh Amendment] immunity") (quoting with approval Seminole Tribe of Florida v. Florida, 801 F.Supp. 655, 658 (S.D.Fla.1992), rev'd, Seminole Tribe of Florida, 11 F.3d at 1028)).
 
 
 28
 The Indian Commerce Clause confers on Congress "the plenary power to legislate in the field of Indian affairs." Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192, 109 S.Ct. 1698, 1716, 104 L.Ed.2d 209 (1989). Just as the Interstate Commerce Clause shifts the balance of state-federal power to Congress to regulate commerce among the states, so too does the Indian Commerce Clause render "Indian relations ... the exclusive province of federal law." County of Oneida v. Oneida Indian Nation of New York State, 470 U.S. 226, 234, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985); Spokane Tribe, 28 F.3d 991, 997 ("Congressional power pursuant to the Indian Commerce Clause ... cannot be less than its authority under the Interstate Commerce Clause.").
 
 
 29
 The States argue that the disparate purposes of the Indian and Interstate Commerce Clauses render the abrogation analysis in Union Gas inapposite. In so doing, the States cite to Cotton Petroleum, 490 U.S. at 192, 109 S.Ct. at 1716, that explained that whereas "the Interstate Commerce Clause is concerned with maintaining free trade among the States ... the central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs." Because the jurisprudence under "Interstate Commerce Clause [ ] is premised on a structural understanding of the unique role of the States in our constitutional system," it "is not readily imported to cases involving the Indian Commerce Clause." Id.
 
 
 30
 The obvious differences between the two clauses, however, do not lead us to conclude that Congress lacks the power to abrogate Eleventh Amendment immunity under the Indian Commerce Clause. Indeed, the States' focus is misplaced. What was relevant for the abrogation analysis in both Fitzpatrick and the plurality opinion in Union Gas was not just the subject matter of the constitutional provisions, but also whether the provisions bestowed plenary power on Congress to the exclusion of the states' authority in the field. Fitzpatrick, 427 U.S. at 456, 96 S.Ct. at 2671; Union Gas, 491 U.S. at 19-20, 109 S.Ct. at 2284-85.[10] Moreover, Cotton Petroleum 's discussion of the disparate applications of the two clauses considered only whether Indian tribes could be treated as states under the Interstate Commerce Clause for purposes of tax apportionment. 490 U.S. at 191-93, 109 S.Ct. at 1715-17. The case did not address Congress' ability to abrogate Eleventh Amendment immunity and therefore is not controlling precedent for our analysis. Spokane Tribe, 28 F.3d 991, 995 (The Cotton Petroleum observation "that Interstate Commerce Clause doctrine cannot always readily be applied to cases involving the Indian Commerce Clause ... does not speak to the scope of congressional power under either [clause]."). Accord Seminole Tribe of Florida, 11 F.3d at 1027 (Cotton Petroleum is "not directly on point" for whether the Indian Commerce Clause allows Congress to abrogate Eleventh Amendment immunity.).
 
 
 31
 Nor do we find convincing the States' contention that the Court's opinion in Blatchford compels us to conclude that Congress lacks the power to abrogate under the Indian Commerce Clause. In Blatchford, the Court held that the Eleventh Amendment bars suits by Indian tribes against states because the states did not consent to such suits when they adopted the Constitution. Blatchford, 501 U.S. at 782, 111 S.Ct. at 2583. There, the tribes argued that, just as the states are deemed to have waived their immunity against suits by sister states, so had the states waived their immunity against suits by tribes. The Court in Blatchford rejected this argument, noting that the states' waiver of immunity against suits by sister states arises from a "mutuality of ... concession" between the states that is inherent in the "constitutional compact." Id. 501 U.S. at 781, 111 S.Ct. at 2582 Because the constitutional compact does not embody an analogous mutuality of concession between the states and the tribes, Blatchford held that the states have not waived Eleventh Amendment immunity to suits brought by tribes. Id. 501 U.S. at 782, 111 S.Ct. at 2583.
 
 
 32
 The States' reliance on this discussion in Blatchford elides the difference between waiver and abrogation. Indeed, the Court discussed both doctrines and held that, in addition to a lack of waiver, Congress did not satisfy the Dellmuth clear-statement abrogation test in 28 U.S.C. Sec. 1362. Id. 501 U.S. at 786, 111 S.Ct. at 2585.[11] The Indian tribes in the cases before us advance only an abrogation claim, not a state waiver theory. The Blatchford Court's historical analysis about waiver in no way undermines Union Gas, which only considered Congress' abrogation powers. Union Gas, 491 U.S. at 23 n. 5, 109 S.Ct. at 2286 n. 5 ("Since Union Gas itself eschews reliance on the theory of waiver ... we neither discuss this theory here nor understand why Justice Scalia feels the need to do so."). Blatchford 's only abrogation analysis was under 28 U.S.C. Sec. 1362, and, as pointed out above, that analysis is not instructive for us because the court found no unequivocal Congressional statement of intent to abrogate in that statute. However, the fact that the Court in Blatchford proceeded to consider the tribe's separate abrogation theory demonstrates that the historical analysis of waiver does not undermine the conclusion that Congress may abrogate Eleventh Amendment immunity pursuant to its Article I plenary powers.
 
 
 33
 For these reasons, we conclude that the Indian Commerce Clause empowers Congress to abrogate the states' Eleventh Amendment immunity and that IGRA constitutes an unequivocal expression of Congress' intent to do so.[12] We therefore affirm the judgment in Kickapoo and reverse the rulings in Ponca, Pueblo of Sandia, and Mescalero.[13]
 
 III. THE TENTH AMENDMENT
 
 34
 We next address whether IGRA violates the Tenth Amendment by requiring states to negotiate tribal-state compacts in good faith. U.S. Const. amend X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."). The Supreme Court recently breathed new vitality into the Tenth Amendment when it observed that "[t]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." New York v. United States, --- U.S. ----, ----, 112 S.Ct. 2408, 2418, 120 L.Ed.2d 120 (1992).
 
 
 35
 To discern whether IGRA entrenches upon the sovereignty that the Constitution preserves for the states, we must examine the nature of the federal directive in IGRA and its impact on the states' regulatory prerogatives. In this regard, we find most instructive the principles articulated in New York and FERC v. Mississippi, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982), a case discussed in New York as marking a critical line in the Constitution's division of authority between the federal government and the states. New York, --- U.S. at ---- - ----, 112 S.Ct. at 2420-21.
 
 
 36
 In New York, the Court reaffirmed that Congress may not exercise its Article I plenary powers to "commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." Id. at ----, 112 S.Ct. at 2420 (quoting Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc., 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)). The unconstitutional exercise of Congressional power in New York was the so-called "take-title" mandate in the Low-Level Radioactive Waste Policy Act, which gave states an option: either accept ownership of (and thus liability for) low-level radioactive waste generated by private operators within their borders or regulate such waste pursuant to Congress' instructions. Id. --- U.S. at ---- - ----, 112 S.Ct. at 2427-28 (interpreting 42 U.S.C. Sec. 2021e(d)(2)(C)).
 
 
 37
 Inasmuch as Congress lacked the authority to impose either option, the Court in New York concluded that a Congressional directive to the states to choose between these two options was constitutionally impermissible as well. Id. --- U.S. at ----, 112 S.Ct. at 2428 ("A choice between two unconstitutionally coercive regulatory techniques is no choice at all."). Writing for the majority, Justice O'Connor explained that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program" because the states are neither "political subdivisions," "regional offices," nor "administrative agencies of the Federal Government." Id. --- U.S. at ---- - ----, 112 S.Ct. at 2434-35. When the federal government compels state regulation, rather than merely encouraging it, state and federal accountability is diminished because the state can no longer regulate "in accordance with the views of the local electorate," while the "federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision." New York, --- U.S. at ----, 112 S.Ct. at 2424.
 
 
 38
 Of course, Congress enjoys several options short of imposing a coercive regulatory directive on the states.
 
 
 39
 First, under Congress' spending power, "Congress may attach conditions on the receipt of federal funds." South Dakota v. Dole, 483 U.S. 203, 206 [107 S.Ct. 2793, 2795, 97 L.Ed.2d 171] (1987) [upholding Congress' authority to condition federal highway funds on the States' adoption of a minimum drinking age of 21 years old].
 
 
 40
 . . . . .
 
 
 41
 Second, ... we have recognized Congress' power to offer States the choice of regulating [an] activity according to federal standards or having state law pre-empted by federal regulation. Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. at 288 [101 S.Ct. at 2366].
 
 
 42
 New York, --- U.S. at ---- - ----, 112 S.Ct. at 2423-24. And third, the Supremacy Clause permits Congress to preempt an entire field of regulation and thereby deprive the states of any regulatory role. See Fidelity Federal Savings & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).[14]
 
 
 43
 If New York teaches that the Tenth Amendment prohibits a federal directive that requires the states to enact or enforce a federal regulatory program, FERC instructs that Congress may require the states to consider, but not necessarily adopt, a federal program. FERC, 456 U.S. at 761-64, 102 S.Ct. at 2138-40. In FERC, the Court upheld three provisions of the Public Utility Regulatory Policies Act of 1978 ("PURPA") against a Tenth Amendment challenge. The provisions required state regulatory commissions to adjudicate disputes arising under PURPA; directed the state commissions to consider adopting federal rate structures and regulatory standards; and required the commissions to follow specified notice and comment procedures in considering the suggested federal rate structures.
 
 
 44
 Most instructive for our purposes is FERC 's discussion of the statutory requirement that states consider the suggested federal standards. The Court explained that this provision did not impermissibly infringe on state sovereignty because its language merely invited states to take action in a preemptible area, rather than directly compelling them to enact a legislative program. Id. at 765, 102 S.Ct. at 2141 (noting that "[t]here is nothing in PURPA 'directly compelling' the States to enact a legislative program"). Indeed, it is this distinction between a permissive and mandatory statutory directive that separates the provision in FERC from the statute in New York: Congress may not usurp state discretion by commanding the states to enact or enforce a federal program, but it may direct a state to consider implementing a federal program so long as the states retain the prerogative to decline Congress' invitation. New York, --- U.S. at ---- - ----, 112 S.Ct. at 2420-24.[15]
 
 
 45
 Guided by the permissive-mandatory dichotomy established in FERC and New York, we conclude that IGRA does not run afoul of the Tenth Amendment. Because IGRA merely directs the state to negotiate in good faith, and stops well short of imposing a requirement on the states to enact or enforce a federal regulatory program, IGRA is more akin to the permissible statutory scheme in FERC than to the constitutionally infirm provision at issue in New York. In essence, the states' duty under Sec. 2710(d)(3)(A) to negotiate with the Indian tribe in good faith is nothing more than a requirement that the states make a good faith attempt to craft a voluntary agreement with the Indian tribe pertaining to Class III gaming on Indian land that is consistent with state policy. FERC, 456 U.S. at 765-66, 102 S.Ct. at 2140-41 (underscoring that PURPA did not require the states to adopt a legislative program). IGRA reflects Congress' attempt to encourage, but not mandate, cooperative rulemaking between the Indian tribes and the states.
 
 
 46
 Under IGRA, if a state is found to have failed to negotiate in good faith with the Indian tribe to conclude a tribal-state compact, the Secretary of the Interior will ultimately prescribe and enforce regulations to govern Class III gaming.[16] See Cheyenne River, 3 F.3d at 281 ("IGRA does not force states to compact with Indian tribes regarding Indian gaming and does not violate the tenth amendment."); Yavapai-Prescott Indian Tribe v. Arizona, 796 F.Supp. 1292, 1297 (D.Ariz.1992) ("IGRA's terms do not force the State to enter into a compact, it only demands good faith negotiation in order to meet state, as well as tribal and federal, interests."). By permitting the states ultimately to abstain from exercising a regulatory role, IGRA's default provision stands in marked contrast to the statute in New York, which strictly confined the states' options to either enacting the federal program or taking title to radioactive waste generated within their borders that could subject them to future liability.
 
 
 47
 An additional factor that distinguishes IGRA from the unconstitutional provision in New York, and reinforces its similarity to the statute upheld in FERC, is that IGRA preserves state governmental accountability in the field of Indian gaming. As discussed above, the Court in New York identified public accountability as a critical component of the states' Tenth Amendment sovereignty. New York, --- U.S. at ----, 112 S.Ct. at 2424. Whereas a Congressional command to the states to enact or enforce a federal program ignores whether the state's citizens approve of such actions, IGRA permits the states to negotiate tribal-state compacts in accordance with the views of the local electorate. If a state has a policy prohibiting all Class III gaming, then Indian Class III gaming is also automatically prohibited. 25 U.S.C. Sec. 2710(d)(1)(B). If it has any other less restrictive policy or preference regarding Class III gaming in particular, or Class III gaming on Indian lands specifically, nothing in IGRA requires the state to surrender or compromise those policies or preferences in attempting to negotiate a compact with the Indian tribe. Of course, the federal government may ultimately override state policy by regulation[17] imposed by the Secretary of the Interior, but that action would not implicate the Tenth Amendment.
 
 
 48
 Nor does IGRA impose an onerous burden on state financial resources. The Supreme Court has made clear that the mere fact that a federal statute requires a state to expend resources in compliance therewith, by itself, is not fatal for Tenth Amendment purposes. FERC, 456 U.S. at 770 n. 33, 102 S.Ct. at 2143 n. 33 ("[I]n a Tenth Amendment challenge to congressional activity, 'the determinative factor ... [is] the nature of the federal action, not the ultimate economic impact on the States.' ") (quoting Hodel, 452 U.S. at 292 n. 33, 101 S.Ct. at 2368 n. 33). In FERC, for example, the Court rejected the claim that the Tenth Amendment prohibited PURPA from imposing a financial burden on state utility commissions by requiring them to comply with certain reporting requirements and to adjudicate federal disputes through their state mechanism. Id. 456 U.S. at 760, 770 n. 33, 102 S.Ct. at 2137, 2143 n. 33. In any event, the states offer no evidence that IGRA requires them to devote excessive resources to negotiate in good faith.
 
 
 49
 To be sure, IGRA does not fit squarely into the permissive category defined in FERC because the statute does not simply invite the states to consider negotiating with Indian tribes, but rather requires the states to negotiate in good faith. Indeed, standing alone and read literally, the court's power under Sec. 2710(d)(7)(B)(iii) of IGRA to order a state and Indian tribe to conclude a compact could be construed as a Congressional command to regulate. 25 U.S.C. Sec. 2710(d)(7)(B)(iii) ("If ... the court finds that the State has failed to negotiate in good faith with the Indian tribe to conclude a Tribal-State compact ... the court shall order the State and the Indian Tribe to conclude such a compact within a 60-day period."). However, this language is not susceptible to a literal reading because it is simply not possible to order two parties to enter into an agreement if they do not agree. Congress could, under its Supremacy Clause powers, impose rules on a reluctant state, but it lacks the power to force the state to agree to something voluntarily.
 
 
 50
 Further, "[w]e do not construe statutory phrases in isolation; we read statutes as a whole." United States v. Morton, 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). IGRA's directive to the states to conclude a compact must be read in the context of the sections that immediately follow in Sec. 2710(d)(7), which contemplate that a state and tribe may fail to agree to a compact. In that event, the states are not required to do anything further, and instead the Secretary of the Interior takes over. Had Congress intended to mandate that the states enter into compacts with Indian tribes, it would not have included these latter sections in Sec. 2710(d)(7).[18] Cf. Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").
 
 
 51
 There are some similarities between IGRA and the Interstate Horseracing Act, 15 U.S.C. Sec. 3001 et seq., recently upheld in Kentucky Division, Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, 20 F.3d 1406, 1415-16 (6th Cir.1994). Under the Interstate Horseracing Act, a race facility must obtain the state's consent to participate in interstate wagering. The state agency responsible for such regulation argued that this provision violated the Tenth Amendment because it required the state to exercise its regulatory authority in either granting or denying such approval. However, the Sixth Circuit concluded that the Act did not require the states to regulate because a state may decline to regulate, thereby retaining the federal regulatory ban on interstate off-track betting pursuant to Sec. 3003 of the Act. Turfway Park, 20 F.3d at 1415-16. Similarly, in the statutory scheme provided by IGRA, the state's refusal to consent to a compact merely triggers permissible federal action. Compare Board of Natural Resources v. Brown, 992 F.2d 937, 946-47 (9th Cir.1993) (declaring unconstitutional Secs. 620c(d)(2) & 620c(d)(3)(A) of the Forest Resources Conservation and Shortage Relief Act because they constitute "direct commands to the states to regulate according to Congress's instructions").
 
 
 52
 For the foregoing reasons, we hold that IGRA does not violate the Tenth Amendment. We therefore reverse the judgments to the contrary in Ponca, Pueblo of Sandia, and Mescalero Apache.
 
 IV. THE EX PARTE YOUNG DOCTRINE
 
 53
 The final issue we consider in these appeals is the tribes' request for an order under IGRA directing the Governors of Oklahoma and New Mexico, respectively, to negotiate tribal-state compacts. The district courts in Ponca, Pueblo of Sandia, and Mescalero Apache dismissed this claim as barred by Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
 
 
 54
 Under the Ex parte Young doctrine, the Eleventh Amendment does not bar a suit in federal court against state officers to enjoin federal law violations. Ex parte Young, 209 U.S. at 159-60, 28 S.Ct. at 453-54. A state officer who violates federal law "is stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." Id. at 160, 28 S.Ct. at 454.
 
 
 55
 A critical limitation on this doctrine, however, is that a federal court may only order a state officer to perform a ministerial act. Id. at 158, 28 S.Ct. at 453 (explaining that the injunction "can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action").
 
 
 56
 In light of our Tenth Amendment analysis, IGRA does not require the states to regulate Class III gaming by entering into tribal-state compacts. Instead, the only obligation on the state is to negotiate in good faith. The act of negotiating, however, is the epitome of a discretionary act. How the state negotiates; what it perceives to be its interests that must be preserved; where, if anywhere, that it can compromise its interests--these all involve acts of discretion. Thus, injunctive relief against the governors is barred under Ex parte Young. Seminole Tribe of Florida, 11 F.3d at 1028-29 (rejecting Ex parte Young claim against the governors of Florida and Alabama because the decision to negotiate is discretionary, not ministerial); Accord Poarch Band of Creek Indians v. Alabama, 784 F.Supp. 1549, 1551-52 (S.D.Ala.1992), aff'd, Seminole Tribe, 11 F.3d at 1028-29.
 
 
 57
 Additionally, the tribes' suits against the Governors are in reality suits against the respective states and thus not authorized under the doctrine of Ex parte Young. "The Eleventh Amendment bars a suit against state officials when 'the state is the real, substantial party in interest.' " Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (quoting Ford Motor Co. v. Department of Treasury of Indiana, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)). "The general rule is that a suit is against the sovereign if 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (quoting Land v. Dollar, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947); Larson v. Domestic & Foreign Corp., 337 U.S. 682, 704, 69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949)) (emphasis added). Because IGRA names only the state as the party to negotiate with Indian tribes, an injunction ordering a Governor to negotiate a compact would operate against the state itself because the state is the only party that may enter into a compact with an Indian tribe. Pennhurst, 465 U.S. at 102, 104 S.Ct. at 909 ("[A] suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief.").
 
 
 58
 Accordingly, we affirm the judgments in Ponca, Pueblo of Sandia, and Mescalero Apache dismissing the tribes' suit against the Governors of Oklahoma and New Mexico.
 
 V. CONCLUSION
 
 59
 In accordance with the foregoing, we conclude that neither the Tenth nor Eleventh Amendment bars these actions against the States of Oklahoma, New Mexico, and Kansas, and thus the district courts should proceed to consider these claims on the merits. We further conclude that the claims in Ponca, Pueblo of Sandia, and Mescalero Apache against the governors of their respective states are inappropriate under the doctrine of Ex parte Young, and must therefore be dismissed. Accordingly, we AFFIRM the judgment in Kickapoo. We REVERSE IN PART and AFFIRM IN PART the judgments in Ponca, Pueblo of Sandia, and Mescalero Apache, and REMAND for further proceedings consistent with this opinion.
 
 
 
 [1]
 Although these appeals were not consolidated, we consider them jointly in this opinion because the dispositive issues are identical
 
 
 [2]
 Amicus Curiae, The National Indian Gaming Association, argues that IGRA creates a property interest in operating gaming on Indian lands that is entitled to Fourteenth Amendment protection. Because the parties did not raise this issue in the district court, we decline to consider it for the first time in these appeals. Farmers Ins. Co. v. Hubbard, 869 F.2d 565, 570 (10th Cir.1989)
 
 
 [3]
 Excluded from Class II, and therefore included within Class III, are such banking card games as baccarat and blackjack, as well as electronic or electro-mechanical facsimiles of any game of chance, and slot machines. 25 U.S.C. Sec. 2703(7)(B)
 
 
 [4]
 Neither an Ex parte Young claim nor the Tenth Amendment question was before the court in Kickapoo
 
 
 [5]
 In Union Gas, a majority of the Court read the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") as a clear expression of Congressional intent to abrogate Eleventh Amendment immunity because, inter alia, CERCLA included states within the definition of "person," the term used to describe those who may be held liable for cleanup costs recoverable under CERCLA, and provided that state and local governments are to be considered "owners and operators," except in narrow circumstances. Union Gas, 491 U.S. at 7-10, 109 S.Ct. at 2277-79. And in Fitzpatrick, the Court held that Title VII of the Civil Rights Act of 1964 satisfies the clear-statement rule because 42 U.S.C. Sec. 2000e(a) expressly defines "person" to include "government" and "government agencies"; and Sec. 2000e(f) includes within the definition of "employee" those individuals "subject to the civil service laws of a State government, governmental agency or political subdivision." Fitzpatrick, 427 U.S. at 449 n. 2, 96 S.Ct. at 2668 n. 2
 
 
 [6]
 Indeed, EHA merely contains a general grant of federal court jurisdiction akin to the infirm jurisdictional statutes in Atascadero, 473 U.S. at 245-46, 105 S.Ct. at 3148-49, and Blatchford, 501 U.S. at 784-90, 111 S.Ct. at 2584-86, that failed to identify States as potential defendants
 
 
 [7]
 The Indian Commerce Clause provides that "The Congress shall have Power ... To regulate Commerce ... with the Indian Tribes." Art. I, Sec. 8, cl. 3. Because IGRA governs commerce with Indian tribes, we conclude that Congress enacted it under the Indian Commerce Clause, not the Interstate Commerce Clause
 
 
 [8]
 Justice White joined Justice Brennan's plurality opinion's conclusion that "Congress has the authority under Article I to abrogate the Eleventh Amendment immunity of the States." Union Gas, 491 U.S. at 57, 109 S.Ct. at 2296 (White, J., concurring in the judgment in part and dissenting in part)
 
 
 [9]
 The states additionally assert that Union Gas remains on especially shaky grounds because three of the five Justices who voted to uphold Congress' power to abrogate pursuant to the Commerce Clause have since retired from the Court. Since the States' briefing, a fourth Justice who so voted has now retired. Nonetheless, we are bound by the Court's holdings until the Court overrules them
 
 
 [10]
 Although Justice Scalia dissented in Union Gas, he opined that "if the Article I commerce power enables abrogation of state sovereign immunity, so do all other Article I powers." Union Gas, 491 U.S. at 42, 109 S.Ct. at 2303. Justice White made the same observation in his concurrence. Id. at 57, 109 S.Ct. at 2296. Of course, for our purposes, we need not speak so broadly and we concern ourselves only with Congressional power to abrogate under the Indian Commerce Clause
 
 
 [11]
 The Court in Blatchford did not explicitly rule on whether Congress has the power to abrogate Eleventh Amendment immunity for suits commenced by Indian tribes against the states. The Court did not reach this question because 28 U.S.C. Sec. 1362 did not contain an unequivocal Congressional expression of intent to abrogate. Blatchford, 501 U.S. at 786, 111 S.Ct. at 2585
 
 
 [12]
 We therefore decline to follow that portion of the Eleventh Circuit's recent ruling in Seminole Tribe of Florida, 11 F.3d at 1028, which concluded that Congress lacks the power to abrogate Eleventh Amendment immunity in IGRA. In Seminole Tribe of Florida, the court held that Congress lacked the power to abrogate Eleventh Amendment immunity when "it legislates in an area typically reserved to the states (such as negotiating regulations with Indian tribes)." Id. The court discerned a distinction between governmental and proprietary functions, concluding that the Supreme Court has allowed federal jurisdiction over states only when the states "partake in an activity typical of private individuals." Id
 We do not read the Supreme Court's Eleventh Amendment jurisprudence as adopting this governmental-proprietary distinction, and take note of the fact that the Court has rejected this dichotomy in at least some in other constitutional law contexts. See, e.g., Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 546-47, 105 S.Ct. 1005, 1015-16, 83 L.Ed.2d 1016 (1985) (denouncing dichotomy in Tenth Amendment jurisprudence as "unsound in principle and unworkable in practice" and thus overruling "traditional [state] governmental functions" test in National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976)). Rather than focusing on the nature of the state governmental activity, cases arising under Congress' authority to abrogate have looked solely to the constitutional source of power under which the federal statute was enacted.
 
 
 [13]
 Because we conclude that Congress has the power to abrogate the states' Eleventh Amendment immunity, we need not reach the Indian tribes' alternative rationale that the States have waived their Eleventh Amendment immunity
 
 
 [14]
 We recognize that, on a practical level, a state may find very little difference between a federal statute that compels it to regulate and one that seeks to induce state regulations by conditioning the receipt of federal funds on the adoption of a state law that promotes a federal policy. Nevertheless, the constitutionally cognizable difference between the two is that, whereas the former infringes the states' sovereignty, the latter ultimately reserves to the states the decision to opt out
 
 
 [15]
 In FERC, the Supreme Court also observed that the state could avoid any obligation to entertain federal proposals by eliminating its own utility commission entirely. However, that option was not seriously advanced as a viable one and it does not detract from the general distinction, upon which that opinion is based, between requiring a state merely to consider a federal proposal and requiring a state to enact or enforce a program
 
 
 [16]
 Under Sec. 2710(d)(7)(B)(vi), if the parties are unable to agree upon a compact, the Secretary of the Interior promulgates procedures--consistent with "the relevant provisions of the laws of the State"--to govern the tribe's Class III gaming under Sec. 2710(d)(7)(B)(vii)
 
 
 [17]
 Except of course, if the state prohibits all Class III gaming in the state, the federal government is not authorized to override any such absolute prohibition. 25 U.S.C. Sec. 2710(d)(1)(B)
 "We do not, in this opinion, address the extent to which the Secretary of the Interior is restricted by Sec. 2710(d)(7)(B)(vii)(I), which authorizes the Secretary to prescribe procedures "which are consistent with ... the relevant provisions of the laws of the State." The cases before us have not yet reached the stage where the Secretary has attempted to fashion or impose any federal provisions regulating Indian gaming, and thus it is premature to speculate as to the nature of the Secretary's provisions or any restrictions that this provison may place upon the Secretary's response.
 
 
 [18]
 25 U.S.C. Sec. 2710(d)(7)(B), provides in pertinent part:
 (iv) If a State and an Indian tribe fail to conclude a Tribal-State compact governing the conduct of gaming activities on the Indian lands subject to the jurisdiction of such Indian tribe within the 60-day period provided in the order of a court issued under clause (iii), the Indian tribe and the State shall each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact. The mediator shall select from the two proposed compacts the one which best comports with the terms of this Act and any other applicable Federal law and with the findings of the court.
 (v) The mediator appointed by the court under clause (iv) shall submit to the State and the Indian tribe the compact selected by the mediator under clause (iv).
 (vi) If a State consents to a proposed compact during the 60-day period beginning on the date on which the proposed compact is submitted by the mediator to the State under clause (v), the proposed compact shall be treated as a Tribal-State compact entered into under paragraph (3).
 (vii) If the State does not consent during the 60-day period described in clause (vi) to a proposed compact submitted by a mediator under clause (v), the mediator shall notify the Secretary and the Secretary shall prescribe, in consultation with the Indian tribe, procedures--
 (I) which are consistent with the proposed compact selected by the mediator under clause (vi), the provisions of this chapter and the relevant provisions of the laws of the State, and
 (II) under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction. (emphasis added).