PUBLISH

**UNITED STATES COURT OF APPEALS**

Filed 1/10/97

**TENTH CIRCUIT**

---

PUEBLO OF SANTA ANA, PUEBLO OF SAN JUAN, PUEBLO OF TESUQUE, PUEBLO OF ACOMA, PUEBLO OF SANDIA, PUEBLO OF ISLETA, PUEBLO OF POJOAQUE, SAN FELIPE GAMING ENTERPRISE BOARD, PUEBLO OF TAOS,

     Plaintiffs - Counter-Defendants - Appellants,

v.

JOHN J. KELLY, in his official capacity as United States Attorney for the District of New Mexico; JANET RENO, Attorney General of the United States; BRUCE BABBITT, United States Secretary of the Interior; UNITED STATES OF AMERICA,

     Defendants - Counter-Claimants - Appellees,

and

STATE OF NEW MEXICO,

     Counter-Defendant - Appellee.

No. 96-2162

GUY CLARK, MAX COLL, GEORGE BUFFETT, STATE OF ALABAMA, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF FLORIDA, STATE OF IDAHO, STATE OF MASSACHUSETTS, STATE OF NEVADA, STATE OF RHODE ISLAND, STATE OF HAWAII, STATE OF KANSAS, STATE OF MICHIGAN, STATE OF OKLAHOMA, STATE OF VERMONT, NATIONAL INDIAN GAMING ASSOCIATION, SAN MANUEL BAND OF MISSION INDIANS, SHAKOPEE MDEWAKANTON SIOUX COMMUNITY, and SISSETON WAHPETON SIOUX TRIBE,

          Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CIV-96-0002-MV)**

---

Richard W. Hughes (John L. Sullivan with him on the briefs), Rothstein, Donatelli, Hughes, Dahlstrom, Cron & Schoenburg, LLP, Santa Fe, New Mexico, for Plaintiffs - Counter-Defendants - Appellants Pueblo of Santa Ana, Pueblo of San Juan, Pueblo of Tesuque, Pueblo of Sandia, Pueblo of Isleta, Pueblo of Pojoaque, San Felipe Gaming Enterprise Board, and Pueblo of Taos.

Peter C. Chestnut and Ann Berkley Rodgers, Chestnut Law Offices, Albuquerque, New Mexico, on the brief for Plaintiff - Counter-Defendant - Appellant Pueblo of Acoma.

Christopher D. Coppin, Assistant Attorney General (Tom Udall, Attorney General of New Mexico, with him on the brief), Albuquerque, New Mexico, for Counter-Defendant - Appellee.

-2-

James F. Simon (Lois J. Schiffer, Assistant Attorney General, Albuquerque, New Mexico, John J. Kelly, United States Attorney, Phyllis A. Dow, Assistant U.S. Attorney, Albuquerque, New Mexico, and Edward J. Passarelli, Trial Attorney, Department of Justice, Washington, D.C., on the brief), United States Department of Justice, Washington, D.C., for Defendants - Counter-Claimants - Appellees.

Victor R. Marshall, Victor R. Marshall & Associates, P.C., Albuquerque, New Mexico, filed an amicus curiae brief for Amici Guy Clark, Max Coll, and George Buffett.

Thomas F. Gede, Special Assistant Attorney General (Daniel E. Lungren, Attorney General, State of California), Sacramento, California, filed an amicus curiae brief for Amici State of State of Alabama, State of Arizona, State of California, State of Florida, State of Idaho, State of Massachusetts, State of Nevada, State of Rhode Island, State of Hawaii, State of Kansas, State of Michigan, State of Oklahoma, and State of Vermont.

Jerome L. Levine and Frank R. Lawrence, Levine & Associates, Los Angeles, California (Kurt V. BlueDog and Andrew M. Small, BlueDog, Olson & Small, Minneapolis, Minnesota), filed an amicus curiae brief for Amici National Indian Gaming Association, San Manuel Band of Mission Indians, Shakopee Mdewakanton Sioux Community, and Sisseton Wahpeton Sioux Tribe.

---

Before **ANDERSON**, **McWILLIAMS**, and **WEIS**[*], Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

This case presents a central, and dispositive, question: whether, under the Indian Gaming Regulatory Act, the Secretary of the Interior can, by his approval, give life to a compact which was void from its inception because the state governor who signed the

---

[*]The Honorable Joseph F. Weis, Jr., United States Senior Circuit Judge for the Third Circuit, sitting by designation.

compact lacked the authority under state law to sign on behalf of the state. We hold that the Secretary cannot, under the Act, vivify that which was never alive, and we therefore affirm the decision of the district court.

Plaintiffs and appellants Pueblo of Santa Ana, Pueblo of San Juan, Pueblo of Tesuque, Pueblo of Acoma, Pueblo of Sandia, Pueblo of Isleta, Pueblo of Pojoaque, and Pueblo of Taos are federally recognized Indian tribes in New Mexico. Plaintiff and appellant San Felipe Gaming Enterprise Board is a gaming enterprise chartered under the laws of the Pueblo of San Felipe.[1] The Tribes have been operating casinos and other gaming facilities in New Mexico. They brought this action, seeking a declaration of the validity of the Tribal-State gaming compacts they had entered into with the State of New Mexico, under the Indian Gaming Regulatory Act ("IGRA"), after the New Mexico Supreme Court held that the Governor of New Mexico, who had signed the compacts, lacked the authority to do so and at least suggested that New Mexico law did not permit the kind of gambling they were conducting. Defendants John J. Kelly, the United States Attorney for New Mexico, Janet Reno, the Attorney General of the United States, Bruce Babbitt, the United States Secretary of the Interior, and the United States of America counterclaimed, seeking a declaration that the Tribes were conducting gambling in violation of federal and state law, and joined the State of New Mexico as a party.[2]

---

[1] We will hereafter refer to the Pueblo tribes as the "Tribes."

[2] There are three other appeals involving identical issues, the outcome of which will
(continued...)

The Tribes and the United States filed cross-motions for summary judgment. The state filed a brief in support of the United States' cross-motion. The district court granted summary judgment to the United States and the State of New Mexico, concluding that the compacts were not valid under IGRA because the Governor lacked the authority under New Mexico law to execute the compacts on behalf of the state. It therefore declared that the Tribes' class III gaming activities violated federal law. The district court granted the Tribes' request for a stay of its judgment, thereby permitting the Tribes' casinos and other gaming facilities to remain open pending this appeal. We affirm.

## BACKGROUND

### I. IGRA

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA") provides a "comprehensive regulatory framework for gaming activities on Indian lands" which "seeks to balance the interests of tribal governments, the states, and the federal government." Ponca Tribe of Oklahoma v. Oklahoma, 37 F.3d 1422, 1425 (10th Cir. 1994), vacated, 116 S. Ct. 1410 (1996). It furthers the dual goals of providing "a

---

[2](...continued)
be determined by our decision in this case: Apache Tribe of the Mescalero Reservation v. New Mexico, No. 96-2156; Apache Tribe of the Mescalero Reservation v. Reno, No. 96-2199; and Jicarillo Apache Tribe v. Kelly, No. 96-2192. The district courts in those cases reached the same conclusion as the district court here: namely, that the compacts permitting those tribes to conduct class III gaming are invalid.

statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" as well as ensuring that gaming on Indian lands is shielded from "organized crime and other corrupting influences." 25 U.S.C. § 2702(1), (2). See Indian Affairs Comm., Indian Gaming Regulatory Act, S. Rep. No. 100-446, at 1-3 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3071-73.[3]

IGRA provides for three types of gaming: class I, class II and class III. Only class III gaming, high-stakes casino-style gaming, is at issue in this case. It "includes such things as slot machines, casino games, banking card games, dog racing, and lotteries." Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114, 1119 (1996). Class III gaming is permitted if it is "located in a State that permits such gaming for any purpose by any person, organization, or entity" and is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . that is in effect." 25 U.S.C. § 2710(d)(1)(B), (C). The rationale for the compact system is that "there is no adequate Federal regulatory system in place for Class III gaming, nor do tribes have such systems for the regulation of Class III gaming currently in place," and thus "a logical

---

[3]IGRA was enacted in response to the Supreme Court's decision in California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987), in which the Court held that California could not enforce its state and local gaming laws on Indian lands because California regulated, as opposed to completely prohibited, such gaming. Thus, Cabazon established a distinction between civil/regulatory laws and criminal/prohibitory laws. States could enforce criminal/prohibitory laws relating to gambling on Indian lands, but not civil/regulatory laws.

choice is to make use of existing State regulatory systems" through a negotiated compact. S. Rep. No. 100-446, at 13-14, reprinted in 1988 U.S.C.C.A.N. 3071, 3083-84. A Tribal-State compact "shall take effect only when notice of approval by the Secretary [of the Interior] of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. § 2710(d)(3)(B). Indian gaming conducted in accordance with the Act's requirements is exempt from federal and state criminal gambling prohibitions.

## II. **Indian Gaming in New Mexico**

Since IGRA's passage in 1988, various Indian tribes in New Mexico have sought to enter into class III gaming compacts with the state. Governor Bruce King appointed a task force in 1990 to negotiate gaming compacts with two tribes, the Pueblo of Sandia and the Mescalero Apache tribes. In 1991, after reaching some form of agreement permitting limited class III gaming, the task force presented the compacts to Governor King for signature, but he refused to sign them. The Pueblo of Sandia and the Mescalero then filed suit against the Governor and the State, seeking to require them to negotiate compacts in good faith, as required at that time by IGRA. See § 2710(d)(7).[4] Governor

---

[4]Our court reversed the district court's dismissal of those suits on sovereign immunity grounds. Ponca Tribe, 37 F.3d 1422 (10th Cir. 1994) (holding that neither the Tenth nor the Eleventh Amendments barred the tribes' suits against the states). The Supreme Court's decision in Seminole Tribe, 116 S. Ct. 1114, overruled our decision in Ponca Tribe.

King apparently refused to negotiate with any tribes during the remainder of his term as Governor.

All but two of the Tribes commenced some form of class III gaming without Tribal-State compacts. The Pueblo of Acoma began class III gaming in 1993. Pueblo of Acoma Answers to Defs.' First Set of Interrogs., Appellants' App. Vol. V at A1617. The Pueblo of Isleta began such gaming in 1990, Pueblo of Isleta's Resps. to Defs.' First Set of Interrogs., id. at A1621; the Pueblo of Pojoaque began in 1992, Pl.'s Pojoaque Pueblo, Resp. to First Set of Interrogs., id. at A1624; the Pueblo of San Juan in 1992, Pl. Pueblo of San Juan's Answers to Defs.' First Set of Interrogs., id. at A1630; the Pueblo of Sandia in 1986, Pl. Pueblo of Sandia's Resps. to Defs.' First Set of Interrogs., id. at A1633; the Pueblo of Santa Ana in 1993, Pl. Pueblo of Santa Ana's Resps. to Defs.' First Set of Interrogs., id. at A1644; and the Pueblo of Tesuque in 1992, Tesuque Pueblo's Resp. to Defs.' First Set of Interrogs., id. at A1657-58. The Pueblo of San Felipe and the Pueblo of Taos began class III gaming after they entered into compacts. Resp. to Defs.' First Set of Interrogs. to Pl. Pueblo of San Felipe Gaming Enter. Bd., id. at A1627; Pl. Pueblo of Taos's Resps. to Defs.' First Set of Interrogs., id. at A1649-52. In May 1994, defendant John Kelly, the U.S. Attorney, entered into non-prosecution agreements with the Tribes who had already commenced gaming activities, agreeing not to take any enforcement action provided the Tribes limit their gaming activities.

Indian gaming became a significant campaign issue in the 1994 gubernatorial campaign. Governor King was defeated for reelection by Gary Johnson, who had publicly committed to signing Tribal-State compacts if elected Governor. At that same election, voters approved a constitutional amendment authorizing a state lottery and legalizing video gambling.[5]

Governor Johnson appointed Professor Fred Ragsdale to negotiate compacts with various Indian tribes, and on February 13, 1995, he signed thirteen identical compacts. The Secretary of the Interior approved twelve of the compacts on March 15, 1995, and published notice of such approval in the Federal Register on March 22. The thirteenth compact, between the Pueblo of Acoma and the State, was approved by the Secretary on April 24, and notice was published in the Federal Register on May 15. Defendant Kelly sent to the tribes letters dated March 21, stating in pertinent part:

> The execution, approval and publication of your tribe's compact should bring it into compliance with applicable federal law. In any event, the approval of the compacts constitutes a change in circumstances warranting termination of the non-prosecution letter.
>
> . . . [T]he letter of non-prosecution shall afford the tribe no protection with respect to conduct occurring after the date of termination.

---

[5]The New Mexico Supreme Court subsequently concluded that the amendment was unconstitutional because it improperly conjoined two separate issues in one amendment. State ex. rel. Clark v. State Canvassing Bd., 888 P.2d 458 (N.M. 1995).

Montoya Aff. Ex. RM-15, Appellants' App. Vol. II at A279; Vigil Aff. Ex. 1, id. at A325. On July 1, 1995, the New Mexico Lottery Act became effective, creating a state-run lottery. N.M. Stat. Ann. §§ 6-24-1 to -34.

The Tribes have spent varying amounts of money constructing new or improved gaming facilities, and have implemented various tribal programs with existing gaming revenues or in anticipation of such revenues.[6] The economic impact of gaming on the lives of Tribe members is significant, and gaming revenues are a major source of income for the Tribes.

---

[6]For example, the Pueblo of Santa Ana spent $1,265,275.00 to expand their existing gaming facility, along with $2,786,950.00 for furnishings and equipment for the expanded facility. Montoya Aff. at ¶ 19, Appellants' App. Vol. II at A262-63. Joseph V. Sanchez, Chairman of the San Felipe Pueblo Gaming Enterprise Board and previous Governor of the San Felipe Pueblo, stated that the San Felipe Gaming Enterprise incurred $17,266,869 in debt for the construction and expansion of a gaming facility, of which "$16,723,869 was borrowed in reliance on the tribal-state compact." Sanchez Aff. ¶¶ 19-20, id. at A287. The Pueblo of Tesuque committed approximately $4.1 million "to construction and equipment after Governor Johnson's inauguration and the approval of the Compact." Vigil Aff. ¶ 9, id. at A319-20. The Pueblo of Isleta spent over $20 million in connection with the construction of a resort/gaming/hotel complex. Lucero Aff. ¶ 4, id. at A349-50. The Pueblo of Pojoaque borrowed or spent over $15 million dollars to renovate and expand gaming and horse-racing facilities. Viarrial Aff. ¶¶ 5-8, id. at A356-57. The Pueblo of Acoma borrowed $3.5 million to purchase class III gaming equipment and casino furnishings. Shutiva Aff. ¶ 4, id. at A361. The Pueblo of San Juan "invested approximately $2 million in buildings, furniture, fixtures, and equipment . . . and has entered into various contracts exceeding $5 million for goods, services, and gaming devices for the operation of Class III gaming under the Compact." Garcia Aff. ¶ 2, id. at A364.

### III. New Mexico Supreme Court Decisions

The status of Indian gaming in New Mexico was considerably impacted by two decisions of the New Mexico Supreme Court.

### A. State ex. rel. Clark v. Johnson, 904 P.2d 11 (N.M. 1995)

On July 13, 1995, the New Mexico Supreme Court ruled that Governor Johnson lacked the authority to sign the compacts on behalf of the state. State ex. rel. Clark v. Johnson, 904 P.2d 11, 24 (N.M. 1995). The Supreme Court also held that "the compact[s] and agreement[s] authorize[] more forms of gaming than New Mexico law permits under any set of circumstances." Id. at 21. The court reached its conclusion about the Governor's authority by examining both the state constitution and any relevant state statutory authority. It held that neither source conferred upon Governor Johnson the authority to enter into the compacts.

With respect to the New Mexico constitution and the doctrine of separation of powers, the court held that the constitution "mandates that it is the Legislature that creates the law, and the Governor's proper role is the execution of the laws." Id. at 22. Thus, "[i]f the entry into the compacts reasonably can be viewed as the execution of law, we would have no difficulty recognizing the attempt as within the Governor's authority as the State's chief executive officer." Id. However, if entry into the compacts "in fact

-11-

conflict[s] with or infringe[s] upon what is the essence of legislative authority -- the making of law," the Governor exceeded his authority.  Id.

In examining the effect of the Governor's entry into the compacts, the court concluded that the compacts "preclude future legislative action" and "foreclose[] inconsistent legislative action" because they "give the Tribe[s] a virtually irrevocable and seemingly perpetual right to conduct any form of Class III gaming permitted in New Mexico on the date the Governor signed the agreement." Id. at 23.  Furthermore, the court concluded that the Governor's entry into the compacts disrupted legislative authority "because the compact strikes a detailed and specific balance between the respective roles of the State and the Tribe in such important matters as the regulation of Class III gaming activities, the licensing of its operators, and the respective civil and criminal jurisdictions of the State and the Tribe necessary for the enforcement of state or tribal laws or regulations." Id.  The New Mexico Supreme Court also held that, by entering into compacts which authorized the Tribes to engage in "all forms of casino-style games," the Governor "contravened the legislature's expressed aversion to commercial gambling." Id. at 24.

The court found further support for its conclusion by observing that, historically, every other compact entered into between New Mexico and other sovereign entities was accomplished through legislative enactment, which the Governor simply approved or

-12-

vetoed. The court concluded these gaming compacts with Indian tribes should be handled the same way.

The New Mexico court then considered whether any statutory authority supported the Governor's unilateral entry into the gaming compacts, and concluded that neither the Joint Powers Agreements Act, N.M. Stat. Ann. §§ 11-1-1 to -7, nor the Mutual Aid Act, N.M. Stat. Ann. §§ 29-8-1 to -3 authorized the compacts.[7]

**B. Citation Bingo, Ltd. v. Otten, 910 P.2d 281 (N.M. 1995)**

The second New Mexico Supreme Court decision relevant to this case was Citation Bingo, Ltd. v. Otten, 910 P.2d 281 (N.M. 1995), decided in November 1995.

---

[7]The Joint Powers Agreement Act authorizes "public agencies" to enter into "agreements" with other public agencies. The statute defines "public agency" to include "this state, an adjoining state or any state department or agency, [or] an Indian tribe or pueblo." N.M. Stat. Ann. § 11-1-2(A). Such public agencies are only authorized to enter into agreements "[i]f authorized by their legislative or other governing bodies." § 11-1-3. The New Mexico Supreme Court held that "[t]his language plainly mandates that the legislature must approve any agreement to which the State is a party." Clark, 904 P.2d at 25.

The Mutual Aid Act permits any public agency, defined as including "the federal government or any department or agency thereof, an Indian tribal council, Indian pueblo council and the state or any county or municipality thereof," N.M. Stat. Ann. § 29-8-2, to enter into a "mutual aid agreement[]" with any other public agency "with respect to law enforcement, provided any such agreement shall be approved by the agency involved and the governor." § 29-8-3. The New Mexico Supreme Court held that while the gaming compacts included some provisions relating to law enforcement, not all of the compact provisions related to law enforcement. Thus, it concluded that the Mutual Aid Act did not provide the requisite authority for the compacts. Clark, 904 P.2d at 25-26.

-13-

The specific issue before the court was "whether a hand-held electronic device known as 'Power Bingo' is a permissible piece of gaming equipment under the Bingo and Raffle Act." Id. at 281. In the course of its decision, however, the court made a number of general statements about New Mexico's gambling laws and policies. It began by observing that it would "narrowly construe the terms of the [Bingo and Raffle] Act" because such a construction was "consistent with this state's policy against gambling." Id. at 282. It further noted that "[w]ith limited exceptions, gambling is a crime in New Mexico." Id. at 283. More significantly, the court stated as follows:

> We take judicial notice of recent newspaper references to 'the Las Vegas-night law' applicable to charities. While the record before this Court does not reveal whether gambling devices traditionally found in casinos have in fact been used in this state for gratuitous amusement or even to make bets, we find no statutory authorization for any 'Las Vegas-night' gambling in New Mexico. We are cited to no authoritative use of the term 'lottery' to include casino-style gaming.

Id. at 283-84 n.2. The court also stated that "video, electromechanical, and computer forms of specifically authorized games are against public policy." Id. at 287.

## DISCUSSION

We review de novo the grant of summary judgment, applying the same legal standard as did the district court. Chiles v. Ceridian Corp., 95 F.3d 1505, 1510 (10th Cir. 1996); Pueblo of Sandia v. United States, 50 F.3d 856, 859 (10th Cir. 1995). We examine the factual record and draw all inferences in favor of the party against whom judgment is

-14-

granted.  Orange v. District of Columbia, 59 F.3d 1267, 1270 (D.C. Cir. 1995).  Under

Rule 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Lowe v. Angelo's Italian

Foods, Inc., 87 F.3d 1170, 1173 (10th Cir. 1996).

The Tribes argue that the compacts are valid and in effect, and that the district

court erred in determining that the compacts were void because the Governor lacked the

authority to sign them on behalf of the state.  The United States argues that the compacts

are in effect under IGRA, but asserts that the class III gaming conducted by the Tribes

violates federal law, and is not conducted in compliance with IGRA, because New

Mexico prohibits such gaming "for any purpose by any person."[8]  It thus urges us to

affirm the district court's grant of summary judgment on this alternative ground.  The

State, as counter-defendant, argues that the district court correctly held that the compacts

are void because invalid under state law, and it joins the United States in its argument that

the Tribes' gaming activities are illegal under state law.

Amicus briefs have been filed by:  (1) the States of Alabama, Arizona, California,

Florida, Hawaii, Idaho, Kansas, Massachusetts, Michigan, Nevada, Oklahoma, Rhode

---

[8]The United States argues that the Tribes' gaming violates the Johnson Act, 15 U.S.C. § 1175, the Organized Crime Control Act, 18 U.S.C. § 1955, and IGRA, 18 U.S.C. § 1166.

Island, and Vermont in support of the State of New Mexico; (2) Max Coll and George Buffet, citizens of New Mexico and legislators currently serving in the New Mexico House of Representatives, and Guy Clark, a citizen of New Mexico who opposes the spread of gambling, in support of the State and requesting that we immediately lift the stay; and (3) the National Indian Gaming Association, the San Manual Band of Mission Indians, the Shakopee Mdewakanton Sioux Community, and the Sisseton Wahpeton Sioux Tribe, in support of the Tribes.

As we have indicated, in order for class III gaming to be exempt from the application of federal and state criminal prohibitions, it must meet three conditions: (1) there must be an approved tribal ordinance authorizing the class III gaming, 25 U.S.C. § 2710(d)(1)(A); (2) the gaming must be "located in a State that permits such gaming for any purpose by any person, organization, or entity," § 2710(d)(1)(B); and (3) there must be a compact "entered into" by the tribe and the state which is "in effect." § 2710(d)(1)(C). A compact "takes effect" when it is approved by the Secretary of the Interior and notice of it is published in the Federal Register. § 2710(d)(3)(B). Failure to comply with any one of the three conditions means the class III gaming is subject to applicable criminal statutes.

The district court held that the compacts in question failed to meet the second condition, in that the Governor's lack of authority to bind the state rendered the compact void, and the subsequent approval of the compacts and publication of notice in the

-16-

Federal Register did nothing to give life to the void compacts. It reached this conclusion by examining IGRA and conducting its own independent review of state law. It thus did not reach the issue of whether the other two conditions were met.

## I. Validity of Compacts

The district court held that the "entered into" and the "in effect" components of 25 U.S.C. § 2710(d)(1)(C) are essentially two separate requirements: (1) the compacts must be validly "entered into" under applicable state law *and* (2) they must be "in effect" pursuant to Secretarial approval and notice. The Tribes and the United States argue approval by the Secretary is all that is required to make the compacts valid and in effect, regardless of whether the compacts were valid under state law.[9] The State agrees with the district court that validity of the compacts under state law is an essential and separate requirement under IGRA.

We hold that: (1) IGRA imposes two separate requirements--the State and the Tribe must have "entered into" a compact *and* the compact must be "in effect" pursuant to Secretarial approval--before class III gaming is authorized; (2) state law determines the procedures by which a state may validly enter into a compact; and (3) in determining

---

[9]It appears that the Pueblo of Acoma argues that, in fact, the Governor did have authority to enter into the compacts. The other Tribes appear to argue that, in any event, the Secretary's approval cured any problem with the Governor's execution of the compacts.

-17-

whether the State and the Tribes have entered into compacts, valid and binding under New Mexico law, we agree with and follow the New Mexico Supreme Court's decision in Clark.

### A. "Entered into" and "in effect" requirements

"'In determining the scope of a statute, we look first to its language.'" United States v. Silvers, 84 F.3d 1317, 1321 (10th Cir. 1996) (quoting United States v. Turkette, 452 U.S. 576, 580 (1981)). Thus, like the district court did, we first examine IGRA's language to determine whether the "entered into" and the "in effect" requirements are separate or whether, as the Tribes urge us, Secretarial approval of the compacts, placing the compact into effect under IGRA, is all that is necessary.

Section 2710(d)(1)(C) of IGRA permits class III gaming "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect." The statute also states as follows:

> The provisions of section 1175 of Title 15 shall not apply to any gaming conducted under a Tribal-State compact that --
>
> (A) is entered into under paragraph (3) by a State in which gambling devices are legal, and
>
> (B) is in effect.

§ 2710(d)(6). Both provisions separate the "entered into" requirement from the "in effect" requirement, the latter provision more clearly than the former. IGRA

-18-

unambiguously provides that a compact goes into "effect" when it is approved by the Secretary and notice is published in the Federal Register. § 2710(d)(3)(B). It does not define what is necessary for a tribe and state to "enter[] into" a compact, nor does it state which branch of state government can or must sign a compact.[10] Thus, the language of the statute suggests that the "in effect" requirement establishes the date when the compact becomes effective under IGRA, but arguably says nothing about whether a state has validly entered into a compact.

The legislative history of IGRA provides some guidance. The Tribes argue the district court "badly misinterpreted Congress's intentions with respect to state involvement in tribal Class III gaming." Appellants' Br. in Chief at 31. They argue that the legislative history shows that the overriding purpose of IGRA was to promote tribal self-sufficiency, and that Congress was "extremely reluctant to open the door to state involvement in the regulation of gaming on Indian lands." Id. As a result, so the argument goes, a compact which was invalid under state law could nonetheless bind the state under IGRA, so long as it receives Secretarial approval.

We do not agree that Congress expressed little concern for state interests when it enacted IGRA. Indeed, the legislative history of the Act is replete with references to the need to accommodate tribal *and* state interests:

---

[10]IGRA does refer throughout only to the "State" as the party which can enter into a Tribal-State compact. See also Ponca Tribe, 37 F.3d at 1437 (noting that "the state is the only party that may enter into a compact with an Indian tribe").

This legislation is intended to provide a means by which tribal and State governments can realize their unique and individual governmental objectives, while at the same time, work together to develop a regulatory and jurisdictional pattern that will foster a consistency and uniformity in the manner in which laws regulating the conduct of gaming activities are applied.

S. Rep. No. 100-446, at 6 (1988), reprinted in 1988 U.S.C.C.A.N. 3071, 3076.  The

Senate Report described the tribal-state compacts as follows:

[T]he Committee concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises such as parimutuel horse and dog racing, casino gaming, jai alai and so forth.  The Committee notes the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply.  The Committee balanced these concerns against the strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands. The Committee concluded that the compact process is a viable mechanism for setting various matters between two equal sovereigns. . . .

In the Committee's view, both State and tribal governments have significant governmental interests in the conduct of class III gaming. . . .  A State's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's public policy, safety, law and other interests, as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens.

Id. at 13, reprinted in 1988 U.S.C.C.A.N. at 3083 (emphasis added).

While preservation of tribal sovereignty was clearly of great concern to Congress,

respect for state interests relating to class III gaming was also of great concern.  We are

hesitant to conclude that Congress intended to permit a state to be bound by a compact

regulating class III gaming which it never validly entered.  Cf. Seminole Tribe, 116 S. Ct.

-20-

at 1119 (observing that IGRA "provides that an Indian tribe may conduct certain gaming activities only in conformance with a valid compact between the tribe and the State") (emphasis added); see also Kickapoo Tribe of Indians v. Babbitt, 43 F.3d 1491, 1495 (D.C. Cir. 1995) ("Clearly, . . . the State of Kansas has an interest in the validity of a compact to which it is a party. . . .").

Several district courts have considered the effect, if any, of a subsequent determination that the particular state representative who entered into the compact in fact lacked the authority to do so. Two of the three courts have reached the same conclusion as the three district courts in New Mexico--that a compact entered into by someone without authority to bind the state is void and without effect, regardless of the Secretary's approval of the compact. Thus, they have implicitly concluded that validity of a compact under state law is a separate requirement from Secretarial approval. See Narragansett Indian Tribe of Rhode Island v. Rhode Island, Nos. 94-0618-T, 94-0619-T, 95-0034-T, 1996 WL 97856, at *2 (D.R.I. Feb. 13, 1996) (holding that a compact signed by the Governor, who lacked authority under state law to sign the compact, "is void in the same sense that any document executed without proper authority is void; namely, it has no legal effect"); Kickapoo Tribe of Indians v. Babbitt, 827 F. Supp. 37, 46 (D.D.C. 1993) ("[B]ecause only the Governor--a person without authority--signed the compact, the State did not enter into the compact. Thus, the compact does not comply with § 2710(d)(8)(A) and is invalid."), vacated on other grounds, 43 F.3d 1491 (D.C. Cir. 1995); cf. Willis v.

-21-

Fordice, 850 F. Supp. 523, 532-33 (S.D. Miss. 1994) (finding, in response to challenge to Governor's authority to enter into a compact, that the Governor in fact had the authority under state law to enter into compact), aff'd, 55 F.3d 633 (5th Cir. 1995).[11] But see, Langley v. Edwards, 872 F. Supp. 1531, 1535 (W.D. La. 1995) ("Compact approval by the Secretary cannot be invalidated on the basis of a governor's *ultra vires* action, because a contrary rule would compel the Secretary to consider state law before approving any compact."), aff'd, 77 F.3d 479 (5th Cir. 1996). We therefore conclude that the "entered into" language imposes an independent requirement and the compact must be validly entered into by a state before it can go into effect, via Secretarial approval, under

_____

[11] In Willis, the Secretary had approved the compact and notice had been published in the Federal Register. Thus, IGRA's "in effect" provision had been satisfied. The court nonetheless examined whether the Governor had the authority under state law to sign the compact. It is difficult to see why the court would examine that question unless it believed that it was a separate requirement from Secretarial approval.

IGRA.[12]  The Tribes make a number of arguments against this conclusion, and we address

each in turn.

---

[12]The Tribes rely on several cases involving state retrocession of jurisdiction  over
Indian reservations in support of their argument that the Secretary's approval of the
compacts conclusively establishes their validity.  See United States v. Lawrence, 595 F.2d
1149 (9th Cir. 1979); Omaha Tribe v. Village of Walthill, 334 F. Supp. 823 (D. Neb.
1971), aff'd, 460 F.2d 1327 (8th Cir. 1972); United States v. Brown, 334 F. Supp. 536 (D.
Neb. 1971).

The retrocession cases involved Congressional legislation, enacted in 1953,
permitting the transfer to states of jurisdiction over criminal and civil actions committed
or arising in Indian country located within a state's borders.  Its purpose was to encourage
Indians to become "first class citizen[s]," on the theory that "subjecting the Indian to
equality of the responsibilities of state law would make him equal in all respects to other
citizens of the state." Brown, 334 F. Supp. at 538.  Observing that it had failed to
accomplish its objective, Congress in 1968 partially repealed the legislation, and, inter
alia, authorized the United States to accept a retrocession from any state of all or any
jurisdiction acquired earlier by the state.  Several states retroceded to the United States
jurisdiction over Indian lands within their borders, and the Secretary of the Interior
accepted the retrocession, only to have a subsequent challenge to the validity of the state's
act of retrocession.  The courts held that the Secretary's acceptance of the retrocession
conclusively established the validity of the retrocession.

The district court distinguished those cases from the situation here, holding that
state retrocession "is a one-time event between the state and the United States;" that the
policy behind the retrocession statute strongly favored federal jurisdiction; that gaming
compacts are ongoing agreements imposing affirmative duties on the states; and that the
policy of finality, important to the retrocession statute, is less important to IGRA. Pueblo
of Santa Ana, 932 F. Supp. at 1295-97.

We agree with the district court that the retrocession cases involve different
considerations from this case, and do not control this case.

-23-

## 1. Non-compact class III gaming under IGRA

The Tribes argue that the fact that IGRA contemplates tribes conducting class III gaming even without a compact, if the State refuses to negotiate one or to accept one proposed by a mediator, supports its argument that a valid compact is unnecessary. The district court drew precisely the opposite conclusion from those provisions in IGRA, 25 U.S.C. § 2710 (d)(7)(B)(vii), and we agree with the district court's interpretation.

As the legislative history makes clear, Congress was concerned about striking a balance between the interests of tribes and of states in class III gaming. Thus, the Act gives states multiple chances to negotiate a compact governing the conduct of such gaming. As the district court observed, it is "[o]nly after rejecting several opportunities to involve itself in the negotiation process [that] the Act terminate[s] the State's opportunity to participate." Pueblo of Santa Ana v. Kelly, 932 F. Supp. 1284, 1293 (D.N.M. 1996). Congress could have permitted Indian tribes to conduct any kind of gaming on Indian lands without any involvement by states. The fact that it provided states with several opportunities to become involved through the compacting process suggests Congressional concern to permit state involvement if a state so desires. The fact that it permits such gaming, if the other requirements of IGRA are met, when a state affirmatively refuses to negotiate a compact in no way minimizes the importance of the compact process. Similarly, to permit a state actor to purport to bind the state when in fact he or she lacks

the authority to do so undermines the significance of the compact process as a means of providing meaningful state involvement if a state so desires.

## 2. **Finality**

The Tribes also argue that the district court's decision undermines finality and forever subjects a compact to collateral attack on state law grounds. The United States makes a related argument that the only way to challenge an approved compact is to ask the Secretary to withdraw his approval, and to challenge his decision not to withdraw approval under the Administrative Procedure Act, 5 U.S.C. §§ 701- 06. We are not persuaded that the possibility of indefinite collateral attack is as real, or as dire, as the Tribes claim it is. We need not reach the argument made by the United States because we have held that, under IGRA, the existence of a valid compact is a requirement for conducting class III gaming.

A compact is a form of contract. Texas v. New Mexico, 482 U.S. 124, 128 (1987) ("'[a] Compact is, after all, a contract'") (quoting Petty v. Tennessee-Missouri Bridge Comm'n, 359 U.S. 275, 285 (1959) (Frankfurter, J., dissenting)). As with any contract, parties entering into one must assure themselves that each contracting party is authorized to enter into the contract. There are familiar, and well-established, methods for obtaining such assurance. In this case, as in the others in which the Governor's authority to sign a compact has been questioned, the challenge came promptly and was quickly resolved.

-25-

Indeed, Governor Johnson signed the compacts in February 1995, they were approved by the Secretary and published in the Federal Register in March 1995, a petition challenging the Governor's authority to sign the compacts was filed in April, and in mid-July of that year (approximately 120 days following the Secretary's approval) the New Mexico Supreme Court unanimously declared that the Governor had lacked the authority to sign them. See also Narragansett Indian Tribe, 1996 WL 97856 at *1 (court certified question of Governor's authority to sign compact within five months of signing of compact); Langley, 872 F. Supp. at 1532 (court ruled on challenge to Governor's authority within three months of signing of compact); Kickapoo Tribe, 827 F. Supp. at 39 (Attorney General filed suit seeking determination of Governor's power to sign compact within three weeks of signing it); cf. Willis, 850 F. Supp. at 524-25 (plaintiff filed action in state court within ten months, and action in federal court within thirteen months of signing of compacts). In practice, it appears that challenges are made quickly, and resolved promptly.

Moreover, while we appreciate the enormous costs, both economic and human, which the Tribes will incur if they must now close gaming facilities they currently operate under these compacts, the Tribes must bear some responsibility for their dilemma, because, as they conceded at oral argument, most of them commenced gaming well

before these compacts were signed.[13]  In the face of the Tribes' admittedly precipitous

conduct, their claimed need for finality now seems less tenable.

### 3.  <u>Secretarial inquiry into state law</u>

The Tribes further argue that our interpretation places "the Secretary in an

untenable position, requiring that he determine with certainty whether or not a compact

presented for approval is fully 'valid' . . . that is, executed by a state official with actual

state law authority."  Appellants' Br. in Chief at 20.  We do not agree.  IGRA makes it

clear that the Secretary must approve a compact within 45 days.  25 U.S.C.

§ 2710(d)(8)(C).  We agree with the Tribes that Congress did not intend to force the

Secretary to make extensive inquiry into state law to determine whether the person or

entity signing the compact for the state in fact had the authority to do so.  However, that

does not mean that consequences should not flow, such as a determination that the

compact is invalid, if it turns out that the state has not validly bound itself to the compact.

Indeed, as Secretary Babbitt said in a letter to Senator Jeff Bingaman of New Mexico,

concerning the compacts at issue in this case:

---

[13]There has been a great deal of argument about whether, or to what degree, the Tribes were aware of possible problems with the Governor's authority to sign the compacts.  The record contains some evidence that the issue was raised, with the Tribes and their counsel, prior to the signing of the compacts.  <u>See</u>, <u>e.g.</u>, Tackett Aff. ¶ 7, Appellants' App. Vol. IV at A1296; <u>see also</u> Appellants' App. Vol. IV at A1300, A1309, A1311; Gover Dep. at 21-22, <u>id.</u> at A1161, Appellants' App. Vol. V at A1496; Yohalem Dep. at 27-28, 57-72, <u>id.</u> at A1541, A1543-45.

> We agree that compacts between Indian tribes and states are valid only if entered into by the appropriate State officials. However, given IGRA's 45-day time constraint and the automatic approval provision, we do not believe that Congress contemplated that the Department would address or resolve complex issues of State law raised by an internal challenge to a Governor's authority. In this regard, we must defer to the representations of Governors, as the Chief Executive Officers of their states, unless it is clear beyond cavil that a Governor lacks the authority to sign a compact.

Ex. 120, Appellants' App. Vol. IV at A1271. As the Secretary observes, a compact is not *valid* unless properly authorized, but the Secretary is not expected to *resolve* state law issues regarding that authority in the 45-day period given to him to approve a compact.

### 4. **Governor's action merely voidable**

The Tribes also assert that the Governor's act of signing the compacts without authority was merely a voidable act, which the Secretary in essence "cured" by approving the compacts. The cases the Tribes cite as support for this argument are, however, factually distinguishable, in that they involve an unauthorized act which was subsequently ratified or approved by the body with clear authority to ratify or approve the action. See, e.g., National Civil Serv. League v. City of Santa Fe, 370 F. Supp. 1128, 1132 (D.N.M. 1973) (if City Manager lacked authority to enter into contract, City Council subsequently ratified the contract). They do not support the argument that a federal official can ratify or authorize an unauthorized state actor's conduct.

In sum, the Tribes' arguments do not convince us that Secretarial approval of the compacts is all that is necessary in order for the compacts to comply with IGRA.

-28-

**B. State law governs validity of compact**

Another, but very closely related, issue about which the parties disagree is whether federal law or state law, or both, govern the validity of a compact. We agree with the courts in Willis, 850 F. Supp. at 532, and Kickapoo Tribe, 827 F. Supp. at 45-46 that determining the validity of a compact necessitates an interpretation of both federal and state law.

IGRA is a federal statute, the interpretation of which presents a federal question suitable for determination by a federal court. Thus, we indisputably have the *power* to determine whether a Tribal-State compact is valid. See West Virginia ex. rel. Dyer v. Sims, 341 U.S. 22, 28 (1951) ("Just as this Court has power to settle disputes between States where there is no compact, it must have final power to pass upon the meaning and validity of compacts."). However, that does not mean that state law plays no role at all in the statute.

As we have held, IGRA imposes two requirements for a compact to authorize class III gaming--the compact must be validly entered into by the state and the tribe, and it must be in effect pursuant to Secretarial approval. The plain language of IGRA makes it clear that Secretarial approval and publication places a compact "into effect." However, IGRA says nothing specific about how we determine whether a state and tribe have entered into a valid compact. State law must determine whether a state has validly bound itself to a compact. See Washington v. Confederated Bands and Tribes of the Yakima Indian

-29-

Nation, 439 U.S. 463, 493 & n.39 (1979) (holding that section 6 of Pub. L. 280 (now codified at 25 U.S.C. § 1324), authorizing "the people of any State to amend, where necessary, their State constitution or existing statutes" to effect the transfer of civil and criminal jurisdiction over Indian lands to the state, required the application of state law to the procedural amendment requirement).[14]  We agree with the district court that IGRA's very silence on this point supports the view that "Congress intended that state law determine the procedure for executing valid gaming compacts." Pueblo of Santa Ana, 932 F. Supp. at 1294.  Thus, the state and Tribe must be validly bound under state law.

## C.  Who decides state law issue

A final related question is whether we must independently decide whether the state validly bound itself under state law, or whether we must follow the New Mexico Supreme Court's determination of that issue in Clark, or whether we need only give some deference to the state court's determination.  The district court held that, under Sims, it

---

[14]The Tribes attempt to distinguish Yakima by arguing that Pub. L. 280 provided for "no federal approval, certification or ratification" of state action assuming jurisdiction, but it provided general procedural requirements for such state action, and left the specifics of those requirements up to state law.  Appellants' Reply Br. at 13.  They argue that IGRA, by contrast, involves only a federal act, the Secretary's approval of the compact, to put into effect the compact, and that it is that federal act alone which satisfies IGRA's procedural requirements.  This ignores that fact that IGRA contemplates two steps--the tribe and state "enter into" a compact, and the compact goes "into effect" when approved by the Secretary.  The requirement that a state "enter into" a compact is, in our view, analogous to the procedural requirements set forth in Pub. L. 280.

must independently review state law and determine whether the state was validly bound. It reached the identical conclusion as the New Mexico Supreme Court--i.e., that the Governor lacked the authority to sign the compact.

The Tribes conceded at oral argument of this case that Clark did indeed hold that the Governor lacked the authority to enter into the compacts. They also conceded that we are required, absent extraordinary circumstances, to accept that determination.[15] They simply argue it is irrelevant under IGRA, because Secretarial approval is all that is necessary to make the compacts valid and binding. The State similarly argues we are bound by the Clark decision. The question remains whether, despite these concessions, we nonetheless are required by Sims, 341 U.S. 22 (1951), to independently examine state law, albeit giving deference to the New Mexico Supreme Court's decision, or whether we simply accept that decision as the authoritative declaration of state law.

In Sims, West Virginia and seven other states had entered into a compact to control water pollution by means of a commission with representatives from each of the states. West Virginia's legislature approved the compact, and attempted to appropriate funds as part of the state's contribution to the expenses of the commission. When the state auditor

---

[15]Amicus National Indian Gaming Association and the tribes which have joined it as amici argue that the Clark decision represented new law which cannot be applied retroactively. The Tribes do not assert this argument, nor was it argued below, and we therefore decline to address it. See Robertson v. Seattle Audubon Soc., 503 U.S. 429, 441 (1992); Knetsch v. United States, 364 U.S. 361, 370 (1960); United States v. Singleton, 16 F.3d 1419, 1429 n.48 (5th Cir. 1994).

refused to pay the appropriation, the West Virginia members of the commission, along with others, brought an action in the West Virginia Supreme Court of Appeals, which held that the legislative act approving the compact was invalid because it violated West Virginia's constitution. The Supreme Court, after independently reviewing West Virginia's law, reversed the state court, concluding that nothing in the compact offended the state constitution. The Court did observe, however, that "[o]f course every deference will be shown to what the highest court of a State deems to be the law and policy of its State." Id. at 28.

In our view, arguments exist supporting either reading of Sims--that Sims requires us to independently examine state law, giving deference to the state court's determination, or that Sims requires us, in this particular case, to accept as binding the state court's determination. We need not explore that issue further, however, as a resolution of the matter would not change the outcome of this case. Whether we give deference to the New Mexico Supreme Court's thorough and careful analysis of state law, or whether we view ourselves as bound by it, we accept as determinative in this case the state court's decision on the question of whether the Governor of New Mexico had the authority, under the New Mexico constitution or statutory law, to bind the state to the compacts. That court unambiguously held that the Governor lacked the authority to bind the state to the compacts. We agree with that decision. The compacts were therefore never validly "entered into" by the state and, as a result, do not comply with IGRA.

## II. **Other IGRA Requirements**

Because we have held that the compacts do not comply with IGRA because the state never validly entered into them, we need not address IGRA's other requirements, in particular whether, or to what extent, class III gaming is permitted in New Mexico.

## CONCLUSION

For the foregoing reasons, the decision of the district court declaring that the compacts pursuant to which the Tribes conduct class III gaming in New Mexico are invalid is AFFIRMED. In so holding, we are acutely aware that while we have reached a decision in this case, as we must, we have by no means solved an extremely difficult and sensitive problem facing tribe members, citizens, and legislators in New Mexico. The only hope for a satisfactory solution is through dialogue and good faith negotiation between all involved parties. We hereby stay the mandate in this case, pending final resolution of this matter, either in this court or the United States Supreme Court.